IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

Case Nos. 20-1077, 20-1081

GHASSAN ALASAAD; NADIA ALASAAD; SUHAIB ALLABABIDI; SIDD BIKKANNAVAR; JEREMIE DUPIN; AARON GACH; ISMAIL ABDEL-RASOUL, a/k/a Isma'il Kushkush; DIANE MAYE ZORRI; ZAINAB MERCHANT; MOHAMMED AKRAM SHIBLY; MATTHEW WRIGHT,

Plaintiffs-Appellees/Cross-Appellants,

v.

CHAD F. WOLF, Acting Secretary of the U.S. Department of Homeland Security, in his official capacity; MARK A. MORGAN, Acting Commissioner of U.S. Customs and Border Protection, in his official capacity; MATTHEW T. ALBENCE, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity,

Defendants-Appellants/Cross-Appellees.

On Appeal from the United States District Court for the District of Massachusetts
Case No. 17-cv-11730-DJC

**BRIEF OF AMICI CURIAE
THE KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA
UNIVERSITY, THE REPORTERS COMMITTEE FOR FREEDOM OF
THE PRESS, AND 12 MEDIA ORGANIZATIONS
IN SUPPORT OF PLAINTIFFS-APPELLEES
URGING REVERSAL IN PART**

[Case caption continued on next page]

Caroline M. DeCell (Bar No. 1195085)
Stephanie Krent (Bar No. 1195088)
Knight First Amendment Institute
    at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
Telephone: (646) 745-8500
carrie.decell@knightcolumbia.org

Bruce D. Brown (Bar No. 1067194)
Katie Townsend
Gabriel Rottman
Caitlin Vogus
Linda Moon
The Reporters Committee for
    Freedom of the Press
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310

## CORPORATE DISCLOSURE STATEMENT
## AND CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The Knight First Amendment Institute at Columbia University has no parent corporations, and no publicly held corporation owns ten percent or more of its stock. The Knight Institute is a non-profit, non-partisan organization governed by a nine-member board of directors, five of whom are associated with Columbia University.

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

First Amendment Coalition is a nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

Freedom of the Press Foundation does not have a parent corporation, and no publicly held corporation owns 10% or more of the stock of the organization.

The International Documentary Association is a not-for-profit organization with no parent corporation and no stock.

The Investigative Reporting Workshop is a privately funded, nonprofit news organization based at the American University School of Communication in Washington. It issues no stock.

The Media Institute is a 501(c)(3) non-stock corporation with no parent corporation.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

New England First Amendment Coalition has no parent corporation and no stock.

The News Leaders Association has no parent corporation and does not issue any stock.

PEN American Center, Inc. has no parent or affiliate corporation.

The Society of Environmental Journalists is a 501(c)(3) non-profit educational organization. It has no parent corporation and issues no stock.

Society of Professional Journalists is a non-stock corporation with no parent company.

The Tully Center for Free Speech is a subsidiary of Syracuse University.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT AND CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ................................................................... i

TABLE OF AUTHORITIES ................................................................. iv

STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE ................. 1

FED. R. APP. P. 29(a)(4)(E) STATEMENT ............................................. 2

ARGUMENT ................................................................................... 4

I.    Government searches of electronic devices at the border burden core First Amendment freedoms ............................................................. 4

      A.    Government searches of electronic devices at the border burden freedom of the press. ...................................................... 5

            1.    Electronic device searches chill reporter-source communications ........................................................ 5

            2.    Reporters are particularly likely to be targeted for border searches ............................................................... 8

      B.    Government searches of electronic devices at the border burden travelers' freedoms of speech and association. .................. 11

II.   Suspicionless searches of electronic devices at the border violate the First Amendment ................................................................. 15

      A.    The government's electronic device searches must be evaluated independently under the First Amendment. ...................... 16

      B.    Suspicionless searches of electronic devices at the border fail First Amendment scrutiny. ............................................. 21

      C.    Electronic device searches conducted without a warrant violate the First Amendment, and the district court erred in holding otherwise. . 26

III.  The First Amendment implications of electronic device searches at the border require scrupulous adherence to the Fourth Amendment warrant requirement. .................................................................... 28

CONCLUSION ................................................................................ 30

CERTIFICATE OF COMPLIANCE ...................................................... 31

CERTIFICATE OF SERVICE ............................................................. 32

# TABLE OF AUTHORITIES

**Cases**

*Alasaad v. Nielsen*, 419 F. Supp. 3d 142 (D. Mass. 2019) .............................. passim

*Baird v. State Bar of Ariz.*, 401 U.S. 1 (1971) .........................................................22

*Boyd v. United States*, 116 U.S. 616 (1886) .................................................... 28, 29

*City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988) .....................26

*Cutting v. City of Portland*, 802 F.3d 79 (1st Cir. 2015) ........................................24

*Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539 (1963)...................24

*Guan v. Wolf*, No. 1:19-cv-6570 (E.D.N.Y.) ............................................................9

*Heller v. New York*, 413 U.S. 483 (1973) ................................................................29

*House v. Napolitano*, No. 11-10852-DJC, 2012 WL 1038816, at *13 (D. Mass. Mar. 28, 2012)....................................................................................................16

*In re Request from the U.K. Pursuant to the Treaty Between the Gov't of the U.S. & the Gov't of the U.K. on Mut. Assistance in Criminal Matters in the Matter of Dolours Price*, 718 F.3d 13 (1st Cir. 2013) ..........................................................23

*Knight First Amendment Inst. at Columbia Univ. v. U.S. Dep't of Homeland Sec.*, No. l:17-cv-00548-TSC (D.D.C.) .........................................................................11

*Marcus v. Search Warrants*, 367 U.S. 717 (1961) ........................................... 28, 29

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) ............................. 22, 23

*NAACP v. Alabama ex rel. Patterson*, 347 U.S. 449 (1958) ..................................22

*New York v. P.J. Video, Inc.*, 475 U.S. 868 (1986)..................................... 17, 18, 27

*Nieves v. Bartlett*, 139 S. Ct. 1715 (2019) ..............................................................16

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983)........ 24, 25

*Riley v. California*, 573 U.S. 373 (2014) ......................................................... passim

*Roaden v. Kentucky*, 413 U.S. 496 (1973)....................................................... 18, 29

*Stanford v. Texas*, 379 U.S. 476 (1965)............................................................ 4, 28

*Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007) ....................................................16

*United States v. Ickes*, 393 F.3d 501 (4th Cir. 2005).............................................18

*United States v. La Rouche Campaign*, 841 F.2d 1176 (1st Cir. 1998) ...................7

*United States v. Ramsey*, 431 U.S. 606 (1977) ................................................. 17, 19

*United States v. Seljan*, 547 F.3d 993 (9th Cir. 2008) ...........................................20

*Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981) ................................................ 6, 23

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) ............................................... 4, 29

## Other Authorities

Alexandra Ellerbeck, *Security Risk for Sources as U.S. Border Agents Stop and Search Journalist*, CPJ (Dec. 9, 2016, 5:02 PM), https://perma.cc/VJ9L-HUG5..7

*BBC Journalist Questioned by US Border Agents, Devices Searched*, U.S. Press Freedom Tracker (May 18, 2017), https://perma.cc/CFK5-RH5E.......................10

Brooke Crothers, *How Many Devices Can a Smartphone, Tablet Replace?* CNET (July 10, 2011 3:59 PM), https://perma.cc/Z8KE-5Y8U ......................................5

CBP Electronic Media Report (07/26/2017), Knight First Amendment Inst. at Columbia Univ., https://knightcolumbia.org/documents/Border-Search-FOIA_CBP003057-cbp-electronic-media-report-7262017.................................14

CBP Electronic Media Report (09/03/2017), Knight First Amendment Inst. at Columbia Univ., https://knightcolumbia.org/documents/Border-Search-FOIA-CBP004721-cbp-electronic-media-report-9032017 .............................................14

Comments of 30 Organizations and 16 Experts in Privacy and Technology, Docket No. DH6-2006-0060 (D.H.S. 2006), https://perma.cc/8YV3-PG3G ..................11

CRCL Complaint Closure (07/11/2017), Knight First Amendment Inst. at Columbia Univ., https://knightcolumbia.org/documents/Border-Search-FOIA-DHS-001-00513-00245-crcl-complaint-closure-07112017 .................................13

CRCL Complaint Intake and Response (3/12/2018), Knight First Amendment Inst. at Columbia Univ., https://knightcolumbia.org/documents/ Border-Search-FOIA-DHS-001-00585-003173-crcl-complaint-intake-and-response-3122018 ...........12

CRCL Complaint Intake Form (5/27/2018), Knight First Amendment Inst. at Columbia Univ., https://knightcolumbia.org/documents/Border-Search-FOIA-DHS-001-00585-003203-crcl-complaint-intake-form-5272018 .........................12

Daniel J. Solove, *The First Amendment As Criminal Procedure,* 82 N.Y.U. L. Rev. 112 (2007)...........................................................................................................21

*Independent Photographer Stopped for Secondary Screening, Devices Seized*, U.S. Press Freedom Tracker (June 28, 2019), https://perma.cc/4XD7-Z6HC /...........10

*Introduction to the Reporter's Privilege Compendium*, Reps. Comm. for Freedom of the Press, https://perma.cc/3JWV-7ZJH ..........................................................6

Jeff Zalesin, *AP Chief Points to Chilling Effect After Justice Investigation*, Reps. Comm. for Freedom of the Press (June 19, 2013), https://perma.cc/U7Z8-FPEK 8

Jonathon W. Penney, *Chilling Effects: Online Surveillance and Wikipedia Use*, 31 Berkeley Tech. L. J. 117 (2016) ........................................................................14

Joseph Cox, *WSJ Reporter: Homeland Security Tried to Take My Phones at the Border*, Motherboard (July 21, 2016, 12:06 PM), https://perma.cc/BMN9-96LW ..................................................................................................................................8

*KFAI FOIA TRIP Complaints Border Electronics Searches* 24, *in Read Complaints About Warrantless Searches of Electronic Devices at the U.S. Border*, N.Y. Times (Dec. 22, 2017), https://perma.cc/CG8K-NEMA.....................................13

Lana Sweeten-Shults, *Anonymous Sources Vital to Journalism*, USA Today (Feb. 28, 2017, 6:29 AM), https://perma.cc/AV7V-Z4K8 ..............................................6

Lindy Royce-Bartlett, *Leak Probe Has Chilled Sources, AP Exec Says,* CNN (June 19, 2013, 10:08 PM), https://perma.cc/K7VR-M5NB ..........................................8

Michael Barbaro, *Cracking Down on Leaks*, N.Y. Times: The Daily (June 18, 2018), https://perma.cc/7ZP5-C2BL ....................................................................7

Michael J. de la Merced, *A World of Deal Making, Gleaned With an iPhone X*, N.Y. Times (Dec. 27, 2017), https://perma.cc/5N4W-2LN8 ................................5

Ryan Devereaux, *Journalists, Lawyers, and Activists Working on the Border Face Coordinated Harassment from U.S. and Mexican Authorities*, The Intercept (Feb. 8, 2019, 11:42 AM), https://perma.cc/SR2Y-Y8KR .............................................9

Seth Harp, *I'm a Journalist But I Didn't Fully Realize the Terrible Power of the U.S. Border Officials Until They Violated My Rights and Privacy,* The Intercept (June 22, 2019), https://perma.cc/6U24-2GQA....................................................10

*Several Journalists Say U.S. Border Agents Questioned Them About Migrant Coverage*, Comm. to Protect Journalists (Feb. 11, 2019, 11:40 AM), https://perma.cc/QYK3-BKSF..............................................................................9

Tom Jones, Mari Payton & Bill Feather, *Source: Leaked Documents Show the U.S. Government Tracking Journalists and Immigration Advocates Through a Secret Database*, NBC 7 (Jan. 10, 2020, 11:43 AM), https://perma.cc/6VPX-B67U ......9

U.S. Press Freedom Tracker, *Rolling Stone Journalist Stopped for Secondary Screening, Has Electronics Searched While Asked Invasive Questions About Reporting* (May 13, 2019), https://perma.cc/RV5B-SKES .......................10

**Rules**

CBP, Directive No. 3340-049, Border Search of Electronic Devices Containing Information (Aug. 20, 2009)....................................................................................4

CBP, Directive No. 3340-049A, Border Search of Electronic Devices (Jan. 4, 2018)................................................................................................ 4, 10

Fed. R. App. P. 29 .........................................................................................................2

Fed. R. App. P. 32 .......................................................................................................31

ICE, Directive No. 7-6.1, Border Searches of Electronic Devices, (Aug. 18, 2009) ......................................................................................................4

**STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE**

Amici curiae are the Knight First Amendment Institute at Columbia University ("Knight Institute" or "Institute"), the Reporters Committee for Freedom of the Press, First Amendment Coalition, Freedom of the Press Foundation, International Documentary Association, Investigative Reporting Workshop at American University, The Media Institute, National Press Photographers Association, New England First Amendment Coalition, The News Leaders Association, PEN America, Society of Environmental Journalists, Society of Professional Journalists, and Tully Center for Free Speech.

Amici file this brief in support of Plaintiffs-Appellees/Cross-Appellants Ghassan Alasaad, Nadia Alasaad, Suhaib Allababidi, Sidd Bikkannavar, Jeremie Dupin, Aaron Gach, Ismail Abdel-Rasoul, a/k/a Isma'il Kushkush, Diane Maye Zorri, Zainab Merchant, Mohammed Akram Shibly, and Matthew Wright (collectively, "Plaintiffs"). Suspicionless searches of electronic devices, if routinely permitted, burden and chill First Amendment-protected activities, including newsgathering. As members and representatives of the news media, amici have a strong interest in ensuring that these searches honor constitutional limits.

## SOURCE OF AUTHORITY TO FILE

Counsel for all parties have consented to the filing of this amici brief. *See* Fed. R. App. P. 29(a)(2).

## FED. R. APP. P. 29(a)(4)(E) STATEMENT

Amici declare that:

1. No party's counsel authored the brief in whole or in part;

2. No party or party's counsel contributed money intended to fund preparing or submitting the brief; and

3. No person, other than amici, their members or their counsel, contributed money intended to fund preparing or submitting the brief.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Personal electronic devices have become extensions of the human mind. Cell phones and laptops store enormous volumes of individuals' expressive materials: their draft work product, private thoughts, associations and professional relationships, and digital records of their whereabouts and communications with others. Suspicionless searches of these devices at the border raise constitutional questions that analog-era precedents cannot answer. Because of the scale and sensitivity of the information stored on these devices, government searches of them pose a grave threat to the First Amendment freedoms of the press, speech, and association.

The district court ruled that the non-cursory, suspicionless searches of Plaintiffs' electronic devices violated the Fourth Amendment. While the district court recognized the First Amendment implications of suspicionless searches of electronic devices at the border, it required only that border agents articulate some reasonable suspicion that a device contains contraband in order to justify a search. *See Alasaad v. Nielsen*, 419 F. Supp. 3d 142, 168–69 (D. Mass. 2019). Both the government and Plaintiffs appeal the district court's decision.

Amici write in support of Plaintiffs, first, to underscore the implications of electronic device searches for First Amendment rights and for the newsgathering rights of journalists in particular. Second, amici argue that this Court should hold

that the First Amendment requires that border agents obtain a warrant based upon probable cause before accessing the vast stores of private, expressive content on those devices. Finally, amici argue that, even viewed solely through the lens of the Fourth Amendment, the serious First Amendment implications of device searches would nevertheless require application of the Fourth Amendment's warrant requirement with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (quoting *Stanford v. Texas*, 379 U.S. 476, 485 (1965)).

## ARGUMENT

## I.     Government searches of electronic devices at the border burden core First Amendment freedoms.

Policies promulgated by U.S. Customs and Border Protection ("CBP") and U.S. Immigration and Customs Enforcement ("ICE") permit border agents to search travelers' electronic devices without any suspicion of wrongdoing.[1] These suspicionless intrusions directly burden the newsgathering rights of journalists and the freedoms of expression and association of travelers. Journalists and travelers

---

[1]     ICE, Directive No. 7-6.1, Border Searches of Electronic Devices (Aug. 18, 2009); CBP, Directive No. 3340-049, Border Search of Electronic Devices Containing Information (Aug. 20, 2009). CBP released a revised directive in January 2018, CBP, Directive No. 3340-049A, Border Search of Electronic Devices (Jan. 4, 2018), relevant provisions of which ICE adopted in supplemental guidance issued in May 2018, *see* Corrected Appellants' Principal Br. 5–6. The searches at issue in this case were conducted pursuant to CBP and ICE's 2009 directives. In any event, the 2018 CBP directive and ICE guidance offers no additional protection from "basic" or manual device searches.

4

have described these burdens in news accounts of their experiences and complaints to the government.

## A. Government searches of electronic devices at the border burden freedom of the press.

Electronic devices are particularly critical tools for the modern-day press. For journalists on assignment, electronic devices serve as notebooks, typewriters, "cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers." *Riley v. California*, 573 U.S. 373, 393 (2014); *see also* Brooke Crothers, *How Many Devices Can a Smartphone, Tablet Replace?* CNET (July 10, 2011 3:59 PM), https://perma.cc/Z8KE-5Y8U; Michael J. de la Merced, *A World of Deal Making, Gleaned with an iPhone X*, N.Y. Times (Dec. 27, 2017), https://perma.cc/5N4W-2LN8. Reporters cannot leave these devices, which are integral to their work, at home when traveling. And unfettered government access to these devices at the border threatens freedom of the press.

### 1. Electronic device searches chill reporter-source communications.

Because electronic devices are necessary to newsgathering, searches of these devices effectively force reporters to disclose First Amendment–protected information to the government. Electronic device searches are highly invasive, especially for journalists. The contents of electronic devices can reveal the stories a journalist is developing, with whom she is communicating, and her specific travel

plans. Disclosure of such information can expose sensitive newsgathering methods and deter potential sources from speaking to members of the media.

Electronic device searches inhibit journalists' communications with confidential sources, who are often necessary for accurate reporting. *See Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981) ("[J]ournalists frequently depend on informants to gather news, and confidentiality is often essential to establishing a relationship with an informant."); Lana Sweeten-Shults, *Anonymous Sources Vital to Journalism*, USA Today (Feb. 28, 2017, 6:29 AM), https://perma.cc/AV7V-Z4K8 (noting that without confidential sources, journalists "would be relying on the official side of the story, and the official side of a story isn't always the whole side"). Some sources are willing to speak to reporters only with an assurance of confidentiality because they reasonably fear retribution if their identities are revealed, including the threat of criminal prosecution, loss of employment, and even risk to their lives. *See Introduction to the Reporter's Privilege Compendium*, Reps. Comm. for Freedom of the Press, https://perma.cc/3JWV-7ZJH. Reporters who travel internationally may not be able to offer that assurance when the mere act of crossing the border exposes their electronic devices to search and disclosure of their sources' identities. Similarly, device searches are especially likely to chill communications between journalists and vulnerable sources. *See, e.g.*, Alexandra Ellerbeck, *Security Risk for Sources as U.S. Border Agents Stop and Search*

6

*Journalist*, CPJ (Dec. 9, 2016, 5:02 PM), https://perma.cc/VJ9L-HUG5 (noting that agents at a Miami airport looked at a photojournalist's WhatsApp messages sent by a Syrian refugee source).

More broadly, when the government can indiscriminately search through or seize journalists' electronic devices, journalists may become unwilling investigators for law enforcement, and sources are deterred from disclosing sensitive and newsworthy information.[2] *See, e.g.*, Michael Barbaro, *Cracking Down on Leaks*, N.Y. Times: The Daily (June 18, 2018), https://perma.cc/7ZP5-C2BL (interviewing Pulitzer Prize-winning *New York Times* journalist Matt Apuzzo, who explained that after it became public that the government had seized his records, sources advised him they could no longer talk to him). For example, when the Justice Department's seizure of the records of Associated Press ("AP") telephone lines (used by more than one hundred reporters) came to light, AP President and CEO Gary Pruitt stated, "Some of our longtime trusted sources have become nervous and anxious about talking to us, even on stories that aren't about national security." Jeff Zalesin, *AP Chief Points to Chilling Effect After Justice*

---

[2]     This Court has considered "the disadvantage of a journalist appearing to be an investigative arm of the judicial system or a research tool of government or of a private party" in determining whether a subpoena against a television network may be enforced. *United States v. La Rouche Campaign*, 841 F.2d 1176, 1182 (1st Cir. 1998) (internal quotation marks omitted).

*Investigation*, Reps. Comm. for Freedom of the Press (June 19, 2013), https://perma.cc/U7Z8-FPEK; *see also* Lindy Royce-Bartlett, *Leak Probe Has Chilled Sources, AP Exec Says*, CNN (June 19, 2013, 10:08 PM), https://perma.cc/ K7VR-M5NB. Suspicionless searches of electronic devices at the border can similarly deter sources from speaking with journalists, impeding the press's ability to report the news and stifling the vital flow of information to the public.

### 2. Reporters are particularly likely to be targeted for border searches.

Journalists are vulnerable to targeted surveillance by means of suspicionless device searches, sometimes in retaliation for critical reporting. Reporters often travel to report on stories of particular interest to the U.S. government, which in turn may increase the likelihood that border agents will stop them and search their electronic devices. For instance, in 2016, agents at LAX airport asked to search two cell phones belonging to a *Wall Street Journal* reporter who stated that her recent reporting had "deeply irked the US government," and whose previous reporting sparked a Congressional investigation into U.S. military corruption. Joseph Cox, *WSJ Reporter: Homeland Security Tried to Take My Phones at the Border*, Motherboard (July 21, 2016, 12:06 PM), https://perma.cc/BMN9-96LW.

More recently, in early 2019, journalists learned that CBP maintained a secret database to specifically monitor and target reporters covering issues related

to migrants crossing the U.S.-Mexico border. *See* Tom Jones, Mari Payton & Bill Feather, *Source: Leaked Documents Show the U.S. Government Tracking Journalists and Immigration Advocates Through a Secret Database*, NBC 7 (Jan. 10, 2020, 11:43 AM), https://perma.cc/6VPX-B67U.

A flurry of news reports that emerged prior to this revelation documented a clear pattern of harassment of journalists at the border, including device searches and detentions. *See Several Journalists Say U.S. Border Agents Questioned Them About Migrant Coverage*, Comm. to Protect Journalists (Feb. 11, 2019, 11:40 AM), https://perma.cc/QYK3-BKSF; Ryan Devereaux, *Journalists, Lawyers, and Activists Working on the Border Face Coordinated Harassment from U.S. and Mexican Authorities*, The Intercept (Feb. 8, 2019, 11:42 AM), https://perma.cc/ SR2Y-Y8KR. Screenshots of the secret CBP database confirm that an "alert" was placed on these journalists' passports to flag them for secondary screening. Jones, Payton & Feather, *Source: Leaked Documents Show the U.S. Government Tracking Journalists and Immigration Advocates Through a Secret Database*, *supra*. According to a lawsuit filed by five of the journalists whose names appear in the database, the individuals selected for secondary questioning also had their cameras searched during questioning or were separated from their cellphones, which may have been searched. *See* Compl. ¶¶ 51, 114, *Guan v. Wolf*, No. 1:19-cv-6570 (E.D.N.Y. Nov. 20, 2019).

Other examples of journalists questioned or searched at the U.S. border from recent years include:

- In June 2019, CBP officers detained independent photographer Tim Stegmaier for over four hours, searching his computer, phone, and camera, which they then seized and retained for three months.[3]

- In May 2019, CBP officers detained *Rolling Stone* journalist Seth Harp in Austin, Texas, for four hours, questioning him about his reporting and searching his electronic devices.[4]

- In May 2017, U.S. border agents questioned a BBC journalist at Chicago O'Hare International Airport for two hours, searched his phone and computer, and read his Twitter feed.[5]

CBP and ICE policies provide no substantive protections for journalists who are selected for device searches. *See, e.g.*, CBP Directive No. 3340-049A § 5.2.2 (stating only that "work-related information carried by journalists[] shall be handled in accordance with any applicable federal law and CBP policy"). Nor do

---

[3]     *See Independent Photographer Stopped for Secondary Screening, Devices Seized*, U.S. Press Freedom Tracker (June 28, 2019), https://perma.cc/4XD7-Z6HC.

[4]     Seth Harp, *I'm a Journalist But I Didn't Fully Realize the Terrible Power of U.S. Border Officials Until They Violated My Rights and Privacy,* The Intercept (June 22, 2019, 8:00 AM), https://perma.cc/6U24-2GQA; *See Rolling Stone Journalist Stopped for Secondary Screening, Has Electronics Searched While Asked Invasive Questions About Reporting*, U.S. Press Freedom Tracker (May 13, 2019), https://perma.cc/RV5B-SKES.

[5]     *See BBC Journalist Questioned by US Border Agents, Devices Searched*, U.S. Press Freedom Tracker (May 18, 2017), https://perma.cc/CFK5-RH5E.

they recognize that journalists may be "flagged" for secondary screening by government officials more often than the average traveler because the nature of their work leads to travel patterns that draw additional scrutiny, such as returning to the United States from high-risk countries, holding one-way tickets, and traveling frequently or on short notice. *See, e.g.*, Comments of 30 Organizations and 16 Experts in Privacy and Technology, Docket No. DH6-2006-0060 (D.H.S. 2006), https://perma.cc/8YV3-PG3G (explaining that passenger profiling systems remain largely shielded from public view and stating that travel itineraries might be analyzed by CBP). These factors collectively make journalists even more likely targets for searches.

### B. Government searches of electronic devices at the border burden travelers' freedoms of speech and association.

The chilling effect of electronic device searches at the border extends beyond journalists' newsgathering rights and reporter-source relationships. More broadly, these searches chill First Amendment activities of ordinary travelers, which further inhibits robust public debate and the free flow of information. Through litigation under the Freedom of Information Act, *see Knight First Amendment Inst. at Columbia Univ. v. U.S. Dep't of Homeland Sec.*, No. l:17-cv-00548-TSC (D.D.C.), amicus Knight Institute has obtained hundreds of complaints filed by individuals whose devices were searched at the border, as well as

thousands of reports documenting device searches conducted by CBP and ICE. These records describe border agents' examinations of travelers' digitally recorded thoughts, communications, and photographs.

Some of these records also detail intrusions into travelers' political and religious associations. For example, in 2016, one traveler, a medical student, was detained by CBP officers in the Abu Dhabi airport for three days. At the beginning of the encounter, CBP officers confiscated the traveler's phone and laptop and demanded passwords to the traveler's Facebook, Gmail, and WhatsApp accounts. Officers asked the traveler intrusive questions about her political beliefs and asked her "what [she] think[s] when Americans say that Muslims are terrorists."[6] The officers did not return her devices until three days later, when they finally allowed her to board a new flight to the United States.

Another traveler was stopped at the border in 2018 and ordered to hand over his devices and provide officers with the cell phone and computer passwords. When the traveler asked if the officers needed a warrant, one officer replied, "This

---

[6]     CRCL Complaint Intake and Response (3/12/2018), Knight First Amendment Inst. at Columbia Univ., https://knightcolumbia.org/documents/ Border-Search-FOIA-DHS-001-00585-003173-crcl-complaint-intake-and-response-3122018.

is the border. We don't need anything."[7] The officers then searched through the traveler's text messages, contacts, and personal photos, and asked the traveler extensive questions about certain text messages. The officers also interrogated the traveler about his political views, any political organizations he belonged to, and whether he hated America or was part of "Antifa."

Many travelers among those who filed complaints reported being subjected to questions about their religious practices. One U.S. citizen noted that "after a lengthy interview, the officers interviewing me confessed that America needed more Muslim leaders and imams like myself. However, . . . they took my cellphone right after and downloaded all my contacts and messages."[8] Another recalled that officers confiscated her phone and demanded her passcode. The officers reviewed videos on her phone, checked her Facebook page, and interrogated her for forty-five minutes about the mosque she attended, whether she personally knew any

---

[7]   CRCL Complaint Intake Form (5/27/2018), Knight First Amendment Inst. at Columbia Univ., https://knightcolumbia.org/documents/Border-Search-FOIA-DHS-001-00585-003203-crcl-complaint-intake-form-5272018.

[8]   *KFAI FOIA TRIP Complaints Border Electronics Searches* 24, *in Read Complaints About Warrantless Searches of Electronic Devices at the U.S. Border*, N.Y. Times (Dec. 22, 2017), https://perma.cc/CG8K-NEMA (June 12, 2012 complaint).

victims of the Quebec mosque attack that had taken place the week before, and her opinion of President Trump's policies.[9]

Search reports completed by CBP and ICE officers show that officers not only reviewed the contents of travelers' devices during border encounters, but also kept records of travelers' social media accounts. During one such search, CBP officers recorded a traveler's account handles on Instagram, Facebook, WhatsApp, Viber, Snapchat, YouTube, and Tango. The officers also made note of the traveler's answers to account security questions, his pin code, and the code to unlock his phone.[10] Other reports show records of the confiscation of travelers' email addresses.[11]

These searches inevitably burden speech and association. As in the context of government surveillance more generally, when individuals fear that their speech will be scrutinized by the government, they will be less inclined to speak. *See, e.g.*, Jonathon W. Penney, *Chilling Effects: Online Surveillance and Wikipedia Use*, 31

---

[9]     CRCL Complaint Closure (07/11/2017), Knight First Amendment Inst. at Columbia Univ., https://knightcolumbia.org/documents/Border-Search-FOIA-DHS-001-00513-00245-crcl-complaint-closure-07112017.
[10]     CBP Electronic Media Report (07/26/2017), Knight First Amendment Inst. at Columbia Univ., https://knightcolumbia.org/documents/Border-Search-FOIA_CBP003057-cbp-electronic-media-report-7262017.
[11]     CBP Electronic Media Report (09/03/2017), Knight First Amendment Inst. at Columbia Univ., https://knightcolumbia.org/documents/Border-Search-FOIA-CBP004721-cbp-electronic-media-report-9032017.

Berkeley Tech. L. J. 117, 125 (2016) (finding a "statistically significant reduction" in Wikipedia traffic to privacy-sensitive articles after the Snowden disclosures in June 2013). When travelers know that they could be subject to encounters touching on political, social, religious, or other expressive or associational activity—activity that the First and Fourth Amendments were designed to protect from unreasonable government scrutiny—they are less likely to engage in that activity.

## II. Suspicionless searches of electronic devices at the border violate the First Amendment.

The First Amendment stands as an independent bulwark against the government's intrusion into individuals' electronic devices, which contain enormously sensitive expressive, journalistic, and associational content. In its opinions below, the district court recognized the serious First Amendment concerns raised by suspicionless electronic device searches. Yet the district court failed to independently analyze Plaintiffs' First Amendment claims, instead concluding that its Fourth Amendment remedy would be sufficient to cure any First Amendment violations. *Alasaad*, 419 F. Supp. 3d at 168–69.

The district court's analysis was incorrect. To give full force to travelers' expressive and associational interests, the government's searches of their electronic devices must be analyzed separately under the First Amendment. Under the relevant First Amendment framework, suspicionless electronic device searches at

the border are plainly unconstitutional. The remedy is equally evident: to search

those devices, the government must "get a warrant." *Riley*, 573 U.S. at 403.

### A. The government's electronic device searches must be evaluated independently under the First Amendment.

The First Amendment stands as an independent source of protection,

separate and apart from the Fourth Amendment, against the search and seizure of

the contents of travelers' electronic devices at the border.[12] *See Tabbaa v. Chertoff*,

509 F.3d 89, 102 n.4 (2d Cir. 2007) ("[D]istinguishing between incidental and

substantial burdens under the First Amendment requires a different analysis,

applying different legal standards, than distinguishing what is and is not routine in

the Fourth Amendment border context."); *House v. Napolitano*, No. 11-10852-

DJC, 2012 WL 1038816, at *13 (D. Mass. Mar. 28, 2012) (independently

analyzing traveler's First and Fourth Amendment claims, noting that the fact a

search "occurred at the border does not strip [the traveler] of his First Amendment

rights"); *cf. Nieves v. Bartlett*, 139 S. Ct. 1715, 1731 (2019) (Gorsuch, J.,

concurring in part and dissenting in part) ("[T]he *First* Amendment operates

independently of the Fourth and provides different protections. It seeks not to

ensure lawful authority to arrest but to protect the freedom of speech.").

---

[12] Amici agree with the Plaintiffs that warrantless searches of electronic devices violate the Fourth Amendment as well.

When the Supreme Court first articulated the so-called "border search" exception to the Fourth Amendment's warrant requirement in *United States v. Ramsey*, 431 U.S. 606 (1977), the Court recognized that searches of expressive content at the border would raise independent First Amendment concerns. *Ramsey* involved a search of incoming international mail that was suspected to contain heroin. *Id*. at 609–10. After holding the search permissible under the Fourth Amendment, the Court separately considered the possibility that the border search policy would chill free speech; it concluded that any such chill would be "minimal," given that the statute at issue prohibited the opening of envelopes absent reasonable suspicion and the "[a]pplicable postal regulations flatly prohibit, under all circumstances, the reading of correspondence absent a search warrant." *Id.* at 623–24. Under the regulations, "envelopes are opened at the border only when the customs officers have reason to believe they contain *other than correspondence*, while *the reading of any correspondence inside the envelopes is forbidden*," absent a warrant. *Id.* at 624 (emphasis added). In other words, the Court made clear that the inspection of expressive content at the border would raise independent First Amendment concerns.

In *New York v. P.J. Video, Inc*., 475 U.S. 868 (1986), the Court again highlighted independent First Amendment protections in the context of searches and seizures of expressive material. There, the Court explained that it had "long

recognized that the seizure of films or books on the basis of their content implicates First Amendment concerns not raised by other kinds of seizures." *Id.* at 873. While the Court held that the probable cause requirement for seizure of expressive material was not greater than the probable cause standard otherwise applicable to the issuance of a warrant under the Fourth Amendment, it also made clear that adherence to the probable cause requirement "protect[s] against gross abuses" of First Amendment rights. *Id.* at 874 (quoting *Heller v. New York*, 413 U.S. 483, 493 (1973)).[13]

Thus, when evaluating the First Amendment implications of suspicionless searches of electronic devices at the border, this Court must account for the breadth and nature of expressive content found on those devices. The Supreme Court recognized as much in *Riley*, where it held that the well-established "search incident to arrest" exception to the Fourth Amendment's warrant requirement did

---

[13]    For this reason, the courts that have interpreted *P.J. Video* to suggest that the First Amendment provides no protections separate from the Fourth Amendment against the search and seizure of expressive material have misunderstood its holding. *See, e.g.*, *United States v. Ickes*, 393 F.3d 501, 507 (4th Cir. 2005). In *P.J. Video*, however, the Court made clear that the First Amendment has in numerous circumstances played an important role in protecting expressive material against seizures that might otherwise have been permissible under the Fourth Amendment. 475 U.S. at 873. Indeed, the Court has previously explained that other warrant "exceptions," such as exigency, may not apply to expressive material under certain circumstances. *See Roaden v. Kentucky*, 413 U.S. 496, 505–06 (1973) (explaining that the police may not rely on "exigency" exception to seize books or film when it would constitute a prior restraint).

not apply to searches of cell phones. 573 U.S. at 386; *see also Carpenter v. United States*, 138 S. Ct. 2206, 2219 (2018) (rejecting the application of the third-party doctrine to cell-site records because of "the seismic shifts in digital technology" that make possible "the exhaustive chronicle of location information casually collected by wireless carriers today"). Because the "search incident to arrest" exception and the border search exception are "similar" exceptions to the Fourth Amendment's warrant requirement, *Ramsey*, 431 U.S. at 621, the Court's analysis in *Riley* is particularly instructive here.

*Riley*'s teachings are twofold. First, the "quantitative and . . . qualitative" differences between electronic devices and other objects that might hold expressive content necessitate rethinking the application of analog-era constitutional doctrines in new technological circumstances. 573 U.S. at 393. The Court reasoned in *Riley* that the rules set up to govern searches of physical objects do not have "much force with respect to digital content on cell phones," explaining that searches of cell phones invade privacy to an unprecedented extent. *Id.* at 386. Recognizing that the two rationales for the search-incident-to-arrest exception—officer safety and preservation of evidence—were not sufficient to justify the "pervasive" threat to privacy posed by cell phone searches, the Court eschewed the Fourth Amendment framework previously applied to searches of objects on an arrestee's person and

imposed a "simple" and appropriately protective regime—requiring officers to "get a warrant." *Id.* at 403.

Second, the Court's concern with warrantless searches of cell phones was inextricably intertwined with the use of those devices for expressive and associational purposes. As the Court explained, cell phones can carry "every piece of mail [owners] have received for the past several months, every picture they have taken, [and] every book or article they have read," as well as "picture messages, text messages, internet browsing history, a calendar, a thousand-entry phone book, and so on." *Id.* at 393–94. And cell phone searches could reveal "private interests or concerns," such as "where a person has been" and "records of . . . transactions," in addition to the owner's communication history with every person she knows stretching back to the purchase of the device. *See id.* at 395–96.

*Riley* thus underscores the error certain lower courts have made in rejecting First Amendment concerns arising from border searches of electronic devices. *See, e.g.*, *United States v. Seljan*, 547 F.3d 993, 1011 (9th Cir. 2008) (Callahan, J., concurring) (quoting *United States v. Ickes*, 393 F.3d 501, 506 (4th Cir. 2005)). Those decisions, which predate *Riley*, mechanically extended analog-era precedent to digital-age questions. And the handful of post-*Riley* cases that have upheld suspicionless device searches ignored *Riley*'s central teaching that courts must consider the scale and sensitivity of the information stored on electronic devices, as

well as their importance as means of communication, association, and newsgathering, by applying independent First Amendment scrutiny to searches of those devices. The rote application of pre-*Riley* doctrine must be rejected, taking into account the unique ability of electronic devices to store and transmit vast quantities of First Amendment–protected expressive and journalistic material.

## B.    Suspicionless searches of electronic devices at the border fail First Amendment scrutiny.

Suspicionless searches of electronic devices demand close scrutiny under the First Amendment in light of *Ramsey* and *Riley*. Part I, *supra*, demonstrates the First Amendment interests at stake when the government conducts such searches at the border. Border agents conducting those searches frequently scrutinize travelers' private readings, writings, and associations. Searches of journalists' electronic devices expose their confidential sources and newsgathering efforts. Searches of other travelers' devices can expose anonymous works. Because this kind of "[g]overnment information gathering can threaten the ability to express oneself, communicate with others, explore new ideas, and join political groups," Daniel J. Solove, *The First Amendment as Criminal Procedure,* 82 N.Y.U. L. Rev. 112, 121 (2007), these searches require careful review. Under any level of First Amendment scrutiny, suspicionless searches of electronic devices at the border are unconstitutional.

The Supreme Court has long recognized the First Amendment's role in protecting against the forced disclosure of personal beliefs, private associations, and anonymous writings. In general, "[w]hen a State seeks to inquire about an individual's beliefs and associations a heavy burden lies upon it to show that the inquiry is necessary to protect a legitimate state interest." *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6–7 (1971). And in *NAACP v. Alabama ex rel. Patterson*, 347 U.S. 449 (1958), the Court held that "state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny," regardless of "whether the beliefs sought to be advanced by association pertain to political, economic, religious, or cultural matters." *Id.* at 460–61. The Court explained that "compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action," and therefore is typically prohibited under the First Amendment. *Id.* at 462.

Anonymous writings, too, enjoy strong First Amendment protection. The Supreme Court has held that "an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995). Because "identification of the author against her will" can "reveal[] unmistakably the content of her thoughts on a

controversial issue," forced identification of a speaker can be "particularly intrusive." *Id.* at 355. Therefore, "exacting scrutiny" applies. *Id.* at 347 (finding forced identification of political pamphleteer unconstitutional).

The First Amendment concerns with unmasking anonymous speakers are especially acute when the speakers are reporters' confidential sources because exposing confidential sources threatens the ability of reporters to gather and report the news. *See Zerilli*, 656 F.2d at 710–11 ("Compelling a reporter to disclose the identity of a confidential source raises obvious First Amendment problems," and "the press' function as a vital source of information is weakened whenever the ability of journalists to gather news is impaired."); *cf. In re Request from the U.K. Pursuant to the Treaty between the Gov't of the U.S. & the Gov't of the U.K. on Mut. Assistance in Criminal Matters in the Matter of Dolours Price*, 718 F.3d 13, 23 (1st Cir. 2013) (recognizing that, in this circuit, the "leading cases regarding confidential sources" require "heightened sensitivity to First Amendment concerns" (internal quotation marks omitted)). As noted above, reporters returning from global assignments often carry with them information from confidential sources.

Regardless of whether the applicable level of scrutiny is the "closest" or most "exacting," suspicionless searches of electronic devices fail. Even under intermediate scrutiny, the government must show that its searches are "narrowly

tailored to serve a significant governmental interest," *Cutting v. City of Portland*, 802 F.3d 79, 84 (1st Cir. 2015) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)), and that they "leave open ample alternative channels of communication." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983); *cf. Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 546 (1963) (requiring state legislature to "convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest" in justifying demand for organization's membership list). The government cannot do so here.

First, suspicionless searches of electronic devices at the border fail to satisfy the "narrow tailoring" requirement. The district court concluded that the government interest at stake is "in stopping contraband at the border," rather than "general law enforcement interest[s] not unique to the border," such as evidence of past or future crimes. *Alasaad*, 419 F. Supp. 3d at 166. Even if this Court adopts the government's assertion that it has a much broader interest in uncovering evidence of any border-related offence, *see* Corrected Appellants' Principal Br. 40–45, the device searches currently conducted by CBP and ICE are not narrowly tailored to advance that interest. These searches are over-inclusive for the simple reason that the overwhelming majority of suspicionless searches reveal no information of any legitimate interest. The government has never suggested

otherwise. *See Alasaad*, 419 F. Supp. 3d at 157 (explaining that the government failed to articulate the "frequency" that device searches at the border uncovered evidence pertaining to criminal activity).

Second, these searches fail to "leave open ample alternative channels of communication." *Perry Educ. Ass'n*, 460 U.S. at 45. In the modern world, there is no realistic alternative to the communication channels that the internet and electronic devices provide, whether a potential alternative is evaluated in terms of speed, scope, breadth of audience, or ability to communicate with otherwise remote persons. *Cf. Riley*, 573 U.S. at 393 (describing "qualitative" and "quantitative" differences in the storage, communicative capacity, and pervasiveness of cell phones compared to pre-digital objects); Part I.A, *supra* (describing journalists' dependence on electronic devices to gather and disseminate news). The government's claim that it may seize and scrutinize literally every device crossing the border leaves no realistic alternative for travelers.

Moreover, the harm from the government's policies extends far beyond those travelers whose devices have been searched. The knowledge that the content of their devices *may* be searched without any cause whatsoever has a chilling effect on the expressive activities of *all* travelers, who may refrain from using their devices for expressive and associational purposes for fear that their communications will be exposed. This chilling effect is exacerbated by the nearly

unfettered authority that CBP's and ICE's policies give border agents to decide whose devices to search and for what reason. *Cf. City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988) (referring to the "time-tested knowledge that in the area of free expression . . . placing unbridled discretion in the hands of a government official or agency . . . may result in censorship"). Suspicionless border searches thus threaten to chill the speech of every international traveler and are inconsistent with the First Amendment.

### C. Electronic device searches conducted without a warrant violate the First Amendment, and the district court erred in holding otherwise.

The district court's opinion glossed over the First Amendment defects inherent in the suspicionless device searches at the border, concluding only that any constitutional infirmities would be cured by the imposition of a reasonable suspicion standard. This conclusion was wrong; the Constitution requires border agents to obtain a warrant before searching electronic devices.

In *Riley*, the Supreme Court rejected the government's contention that officers could conduct searches of cell phones incident to arrest if they had a reasonable suspicion that they would uncover "information relevant to the crime, the arrestee's identity, or officer safety." 573 U.S. at 399. The Court reasoned that such searches "would sweep in a great deal of information, and officers would not always be able to discern in advance what information would be found where." *Id*.

Here, too, even if officers searched devices only when they had a reasonable suspicion that the devices contained contraband, the searches "would sweep in a great deal of information," much of it expressive in nature. *Id*.

The Court has long held that the warrant requirement is critical when searches implicate protected expressive or associational material. *See id.*; *Carpenter*, 138 S. Ct. at 2214 (explaining that the warrant requirement applied to cell-site records, which "provide[] an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations'" (quoting *United States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring))); *P.J. Video*, 475 U.S. at 873 (recognizing the importance of the warrant requirement in ameliorating the First Amendment concerns raised by searches of expressive material).

Failing to appreciate this precedent, the district court explained that it could not see "what less restrictive means could be employed here." *Alasaad*, 419 F. Supp. 3d at 169. But a warrant requirement would be far less restrictive of travelers' expressive and associational rights while allowing the government to search the devices most likely to contain contraband. As the Supreme Court explained in *Riley*, "[r]ecent technological advances . . . have . . . made the process of obtaining a warrant itself more efficient." *Riley*, 573 U.S. at 401. And CBP and ICE must already obtain warrants for certain searches—for example, officers

obtain warrants before reviewing international correspondence. Corrected App.

317–18, 320–21. The warrant requirement, therefore, is a necessary constitutional

safeguard to protect travelers' expressive and associational material at the border.

### III. The First Amendment implications of electronic device searches at the border require scrupulous adherence to the Fourth Amendment warrant requirement.

At the very least, the Court should assess Plaintiffs' Fourth Amendment

claims against the backdrop of the First Amendment interests implicated by device

searches at the border. The Fourth Amendment's warrant requirement is

intertwined with the free press guarantee in the First Amendment and should be

interpreted in that light.

The history of the Fourth Amendment is "largely a history of conflict

between the Crown and the press." *Stanford*, 379 U.S. at 482. The Crown's use of

"general warrants," which allowed government agents to search "private houses for

the discovery and seizure of books and papers that might be used to convict their

owner of the charge of libel," *Boyd v. United States*, 116 U.S. 616, 626 (1886),

formed "part of the intellectual matrix within which our own constitutional fabric

was shaped," *Marcus v. Search Warrants*, 367 U.S. 717, 729 (1961). The use of

these warrants to stifle free expression was a primary concern of the pre-

Revolution English courts, and one of the Founders' rationales for adopting the

Fourth Amendment. *See Stanford*, 379 U.S. at 483–84 (citing *Entick v. Carrington*,

19 How. St. Tr. 1029 (C.P. 1765) and *Wilkes v. Wood*, 19 How. St. Tr. 1153 (C.P. 1763)); *Marcus*, 367 U.S. at 729; *Boyd*, 116 U.S. at 626–27.

Recognizing this historical connection between the free press and the Fourth Amendment, the Supreme Court has required adherence to the warrant and probable cause protections of the Fourth Amendment with "scrupulous exactitude" when confronted with searches and seizures of materials that "may be protected by the First Amendment." *Zurcher*, 436 U.S. at 564 (quoting *Stanford*, 379 U.S. at 485). Indeed, First Amendment protections of materials to be searched or seized can change the analysis of whether an exception to the Fourth Amendment's warrant requirement applies. That is, "[a] seizure reasonable as to one type of material in one setting may be unreasonable in a different setting or with respect to another kind of material." *Id.* (quoting *Roaden*, 413 U.S. at 501). For that reason, the Supreme Court held that the exigency exception to the warrant requirement is inapplicable to the seizure of allegedly obscene materials when such a seizure might effectively constitute a prior restraint. *Roaden*, 413 U.S. at 504. The Court then extended that holding, requiring a warrant even if the seizure of such material would not constitute a prior restraint. *Heller*, 413 U.S. at 492–93.

The border search exception to the warrant requirement should be treated no differently. The only measure sufficiently protective of the speech and associational rights of travelers, and the newsgathering activities of journalists, is

29

to make the often confidential and sensitive contents of their electronic devices subject to search only pursuant to a warrant based on probable cause.

## CONCLUSION

For the foregoing reasons, the Court should hold that the search of a traveler's electronic devices violates the First as well as the Fourth Amendment absent a warrant supported by probable cause.

Dated: August 7, 2020                                  Respectfully submitted,

                                                  /s/ Bruce D. Brown

Caroline M. DeCell (Bar No. 1195085)    Bruce D. Brown (Bar No. 1067194)
Stephanie Krent (Bar. No. 1195088)      Katie Townsend
Knight First Amendment Institute         Gabriel Rottman
   at Columbia University                Caitlin Vogus
475 Riverside Drive, Suite 302           Linda Moon
New York, NY 10115                   The Reporters Committee for
Telephone: (646) 745-8500               Freedom of the Press
                                         1156 15th St. NW, Suite 1020
                                       Washington, D.C. 20005
                                       Telephone: (202) 795-9300
                                       Facsmile: (202) 795-9310

**CERTIFICATE OF COMPLIANCE**

I, Bruce Brown, do hereby certify that the foregoing brief of amici curiae:
(1) complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because,
excluding the parts of the document exempted by the Fed. R. App. P. 32(f), it
contains 6,267 words; and (2) complies with the typeface requirements of Fed. R.
App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6)
because it has been prepared in a proportionally spaced typeface using Microsoft
Office Word in 14-point Times New Roman font.

Dated:  August 7, 2020

/s/ Bruce D. Brown
Bruce D. Brown
The Reporters Committee for
  Freedom of the Press

## CERTIFICATE OF SERVICE

I, Bruce D. Brown, do hereby certify that I have filed the foregoing Brief of Amici Curiae electronically with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the appellate CM/ECF system on August 7, 2020. All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Bruce D. Brown
Bruce D. Brown
The Reporters Committee for
    Freedom of the Pres